Good morning, Your Honors. Evan Fray-Witzer for the appellant, FF Magnat, also referred to as Oron or Oron.com. I'd like at this time, Your Honors, to reserve five minutes for rebuttal. Your Honors, this is the appeal of a grant of a preliminary injunction which froze all of the assets of FF Magnat, a Hong Kong company with no significant connections to the United States, in a case in which the plaintiff seeks only monetary damages under Section 504B of the Copyright Act, damages which the Supreme Court has said are legal in nature, which would or should have been. The Supreme Court has expressly held in that Chauffeur's case that discouragement of profits is equitable. So how can you say that the Supreme Court has held just the opposite? Well, Your Honor, first of all, I would say in Feltner, the Supreme Court was not dealing with discouragement of profits in that case. It was dealing with statutory damages. But they did discuss and compare the statutory damages. In the most glancing way. And we've got another case that says specifically that discouragement of profits is equitable. I don't know. If we were going to weigh the two, I would give a lot more weight to Chauffeurs than to Feltner. Well, the Chauffeur case, Your Honor, if I'm correct, was dealing with not 504 or the trademark act, which has very different language on just that precise point. Whereas the trademark act talks about those damages, those particular damage, that particular remedy being for the court to consider, the trademark, the Copyright Act has, and this is what Feltner says, that language about the court considering it is absent. And it's that distinction between the language in 504B and the language in the Trademark Act that I think makes the difference. In what other context can you point us to where discouragement of profits has been characterized as a legal remedy? Because I'm not aware of a single one. Your Honor, in my apology, Amelin Pharmaceuticals, this Court said, profits do not constitute the type of harm that is fully compensable through money damages. Profits due to lost sales. I'm talking about discouragement of profits that the wrongdoer has obtained. That sounds like a totally other case. That's a lost profit on the other side, I think. Exactly. The Amelin case is the flip side. I mean, it's I lost profits as a result of something you did. Right. The plaintiff lost money. Therefore, I want to recover those. That's money damages. Well, I think, Your Honor, that if you look at, and there hasn't been a lot of case law specifically dealing with 504B, but if you look at post-Feltner, there are one or two cases and a lot of commentary that basically says, and I admit that Feltner does address the issue in sort of a glancing comment, but says that where the Court in Feltner looked at that statute and examined the historical background of the award of profits in a copyright case, they concluded that the damages were legal in nature and not equitable in nature. But that was damages. Wasn't there a distinction being made between damages and a discouragement of profits? That doesn't negate the fact that a discouragement is still an equitable remedy. So we're back where we were when you started. And maybe, Your Honor, I have misspoken in calling it a damage, because what the commentary has all talked about is 504B, and 504B is the only part where it talks about profits. So perhaps I'm incorrect in referring to it as a damage, but it is the 504B remedy  Well, Data General made that same distinction to which I refer, and it cited 504B in making the distinction between damages and discouragement of lost profits. Do you have anything that negates Data General? I don't, as I'm here today, Your Honor. I would ask for an opportunity to respond to Data General at a post-argument. I would say, however, that in looking at the issue, as I said, a number of courts post-Feltner have said that every decision post-Feltner, even in the surprisingly, even in the area of trademark, has found that the discouragement of profits under that statute to be legal and not equitable in nature. I would also, Your Honor, back up, though, to a question that I think is somewhat more preliminary, which is the question of personal jurisdiction over a Hong Kong company with so few connections to the United States. The case, Your Honors, is brought under Rule 4K2, the Federal Long-Arm Statute, and I don't want to jinx myself in quoting it, but in Holland, America, you had mentioned that in the 14 years at that point since Rule 4K2 was enacted, there hadn't been a single case that this Court found appropriate as an exercise of jurisdiction. It's been another six years. In the 20 years now, the Ninth Circuit has never found an exercise of jurisdiction to be appropriate under 4K2, and I'm certainly hoping that this isn't the landmark case. Although my brother dismisses the notion that 4K2 analysis is somehow different than any other kind of jurisdictional analysis, I would point out that this Court has repeatedly said that great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field. Litigation against an alien defendant creates a higher jurisdictional barrier. And I don't think that it's accidental that this Court, and so few appellate courts, have indeed found jurisdiction to be proper under 4K2. Kagan, let me get what's actually the nub of your argument there. And it's presumably that the contexts are insufficient. Is that really the prong that you think that the Court went wrong on? It is, Your Honor, although I would say, and I'm about to go there, but I would say also that you have dual concerns here, that 4K2 really has been sparsely used because there are concerns about our using our notions of personal jurisdiction on foreign defendants, but also particularly in a case of a copyright case where the courts have repeatedly said that our copyright laws end at the borders of the United States. This is application of our copyright laws to a company that is wholly in Hong Kong and operated wholly in Hong Kong. But, Your Honor. But our concern about copyright law ending at the borders and not having extraterritoriality relates primarily to foreign infringement. But here, if you look, and there's other evidence, but for by way of shorthand, if you look at the district court's order, you know, pages 4 and 5, this isn't a case where they're talking about extraterritoriality. We're talking about the domain name registration. We're talking about U.S. users. We're talking about uploading from the U.S., from U.S. users, not necessarily from foreign servers. So it seems to me that, like it or not, your case lands in a different world than some of the prior case concern about extraterritoriality. Maybe you can tell me why that's not accurate. I think there are two reasons, Your Honor. The first is that, unlike many of the cases that this Court and other courts have dealt with, we are dealing here with a case of secondary infringement. And I think that really does make a big difference to how you have to analyze the case, because there isn't an argument, and there hasn't been an argument, that Oron or FF Magnet committed any of these infringements themselves. All that is alleged is that FF Magnet operated a website out of Hong Kong that users uploaded materials to, and perhaps, and I know, Your Honor, you've cautioned attorneys against thinking that judges don't understand the Internet, and this panel in particular I know does. But if I can talk about the technology for just a second, the Oron.com website was what is commonly now known as cloud storage. It's very much like Dropbox or Apple's iCloud. Users use... That's probably not, that's a subject that's probably not totally agreed to, right, by the other side, that this is true cloud storage. Well, I don't think that my brother disputes that it's cloud storage. He certainly disputes the reasons that people are using Oron.com. Although, I would say that if you look at the record, other than the fact that there's no evidence for that. There's no evidence whatsoever as to what the users were using most of Oron for. So just like with Dropbox, where nowadays you can get a link for any file that you've uploaded to Dropbox and you can share it with anyone freely, that is the same type of technology that was being used by Oron.com. Now, the uploading, and Your Honor said, well, you have uploading and downloading that's taking place from the United States. Again, Your Honor, that is really not clear. The record doesn't really support, first of all, there's no evidence whatsoever in the record that a single U.S. user downloaded any of Datatex's copyrighted materials, not any of it. There's no evidence as to where the materials were uploaded from. And so all you have with respect to ---- Let me ask you. Ultimately, though, to prevail on the personal jurisdiction argument, they're not going to have to show that U.S. users were specifically uploading their material, do they? Don't they just have to show that any U.S. users? I'm not talking about to prevail on the merits.  No, I understand, Your Honor. But the argument that has been made and what the district court said that they were ruling on was specific jurisdiction. And if this is a specific jurisdiction case, then, yes, I think they do have to show that their materials, because it has to be related to their cause of action, their materials had to have been uploaded from the United States. Their materials had to have been downloaded into the United States. There has to be some connection between the infringement that they are claiming and the United States. And I don't think that there's record evidence for any of it. Could you just step back, because I didn't want to slide by your one statement that you said that we ought to be looking at this different because it's secondary liability and secondary infringement. Why and where in the statute do you find that kind of a distinction that we ought to be looking at? Well, I think, Your Honor, that that brings you to the express aiming or express direction prong of Calder. And the reason that I think that that is an important distinction is because it's very difficult to make the argument that a web service that did not themselves upload or download the infringing materials was expressly aiming or directing their conduct at the United States. And, in fact, it is hard to say how the district court concluded that. They looked at three factors. They said, one, there was a substantial number of hits from the United States. I believe that almost every court to have looked at the issue has said that the simple fact that a website operates and is accessible anywhere in the world doesn't mean that it's expressly aimed or expressly directed. One of the cases that we cite colorfully says that despite the court found that a substantial portion of their hits came from the United States. Isn't that sufficient? Twelve percent, Your Honor. But compared to the rest of the world, that's not insignificant, is it? I would not say that it is insignificant, Your Honor. And I know it's not binding here. That's also Oren's largest single market, isn't it? I believe that the United States may have had the largest percentage. But when you come down to it, there's still 88 percent of all of its service being outside of the United States. But that maybe isn't depending on how you look at express aiming. It doesn't say exclusive aiming. It's express aiming. And if that's your largest market, and we have 300 million people here, the fact that you also have other markets doesn't really undermine that you might have had express aiming at your largest market, does it? Well, it does not exclude that possibility, Your Honor, but it also doesn't place the burden on Oren to show it. It places the burden still on the plaintiff. And there's been no evidence of express aiming other than the fact that in the end there were a lot of hits from the United States. In fact, we cite two other district court cases on almost identical facts in our briefs where they had 14 percent and 17 percent of the hits coming from the United States, and the courts went back and said, well, you know, we have consistently said that the simple fact that you operate a website that is just as accessible in Uzbekistan as it is in the United States is not going to be enough to justify personal jurisdiction. I know it's not binding here in the Ninth Circuit, but, Your Honor, in the Southern District of Ohio, you said just that in the Oasis Corporation v. Judd some 12 years ago. Also, Your Honor, the district court said that Oren directly profited from those hits in the form of subscription fees. There is no evidence whatsoever that that is accurate. And there's certainly no evidence that any single user, not one, bought a subscription because of data text materials. And, again, it's a specific jurisdiction case. And the importance here, again, is that Oren was never selling access to files. Anyone could access any file, any time, for free if they had the link. The only thing that Oren sold was faster download times. It's a freemium model that is very common nowadays on the Internet. Now, perhaps if my brother was able to say that they could point to users who had purchased memberships to download their materials faster, then he would be able to get past that. But there is not any allegation, and there's no proof in the record, that that ever happened. The third factor that the district court relied on in finding personal jurisdiction was the website's terms and conditions. And I would say, with respect to this specifically, it would be a horrible precedent to set to say that that's accurate, because specifically what the court pointed to was the fact that the terms and conditions for the website said, if there's infringing materials, here's how you notify us under the DMCA. The only thing they pointed to as knowledge from the terms and conditions is the fact that they said, by virtue of having DMCA notification policies, that that itself shows that we knew that the materials could be infringed upon in the United States. And if you rule that that is a basis for personal jurisdiction, it's easy to say what's going to happen. Every website that operates outside the United States will take off of their website the way that you report infringing materials. It will actually increase the infringement of copyrighted materials, not decrease  And finally, I want to talk about the what we see to be the improper shifting of the burden of damages in this case. I think Section 504 has to be the starting point itself. It talks about the fact that damages have to be attributable to the infringement, but that's not where the district court went. The district court instead shifted the burden to Oron to prove what damages weren't attributable to infringement. It's very much like the Polar Bear Productions case where this Court said that it would deny relief where the profits are only remotely or speculatively attributable to the infringement. That's the case here. Their argument is the timex watch case. Yes. Yes, Your Honor. It's the timex watch case. It's the same kind of argument that really what Data Tech says is our materials acted as a draw. It made your site more attractive. But it doesn't actually say, okay, we can now show what profits are attributable. The district court, we would argue, Your Honors, improperly said that the burden was on Oron to show what damages were not attributable. And I see that my time is up. Can you just – oh, maybe you can do this when you sit down. Just find where you think the language of the district court made that shift, and you can tell us that on rebuttal. Yes. Thank you. May it please the Court. D. Gil Sperlein for Plaintiff and Appellee Data Tech Enterprises, LCC. I don't have bifocals, and I want to look you in the eye. So I apologize that I'll be going back and forth between my readers. You probably don't know what it's like, but maybe some of the other judges do. I'm going to try to go in the circuit, not on the bench here, in the circuit. And what I'm going to do here is try to just follow the arguments that Mr. Freywitzer presented and rebut some of them, unless the Court wants to direct me into a different area. I'm particularly interested in this idea of whether the disgorgement of illicit I want to clear up one of the things from the Feltner case where Justice Thompson said, in just kind of a fleeting moment, he said that the 504B damages and profits are generally not equitable. I think right in that sentence, he says generally, and he says he's talking about damages and profits. The damages are money remedies, legal remedies, and the disgorgement of profits is equitable in nature. So when you put the two together, maybe that's what he was talking about when he said generally. I don't know. But also, he's looking there at the right to a jury trial, and if you have equitable remedies mixed with legal remedies, then you're going to be entitled to a jury trial because it's fundamental to uphold the Seventh Amendment right to a jury trial on legal issues. So that's really where he was focused. And if you look just a little bit further down in the case, he goes on to say, Columbia makes no attempt to draw an analogy between an action for statutory damages under 504C and any historical cause of action, including those actions for money relief that we have characterized as equitable, such as actions for disgorgement of improper profits. So I don't think there's any doubt that Feltner does not stand for the proposition that disgorgement of profits is not equitable in nature. My brother also mentioned that he said post-Feltner, there were no cases in which in the trademark context where statutory damage or where profits were considered equitable relief. And I think he was referring to a quote from a case that he included in his brief. I think it's pronounced Klipsch. And the Court said, Subsequent to Feltner, every decision of which the Court is aware has concluded that statutory damages under the Lanham Act are a remedy at law, not one at equity. Again, it wasn't dealing with this rather unique and traditionally equitable relief of disgorging profits, which is a type of restitution. And the case law, although there's limited case law in the copyright context, the historical analysis will always show that that is an equitable relief. Turning to, I suppose, the issue of personal jurisdiction, one thing that my brother argues is that there haven't been a lot of these cases. So I don't know if he's arguing that that means that they're particularly tough, but I can tell you there's a reasonable explanation why there's not many of those cases. If you know that you're subject to jurisdiction somewhere in the United States and you want to control the litigation, all you have to do is say we're subject to jurisdiction in Florida or Maine or wherever you want to go, and that's where you wind up. It's only because they've refused to identify a jurisdiction where they are subject to personal jurisdiction that 4K2 applies, and so they're subject to jurisdiction anywhere in the world or anywhere in the country. Sorry. So I think that that's an explanation as to why you don't, you just don't see that many of those cases. And that's not an explanation to me as to why foreign operators, whether they're server providers or whether they're content providers or otherwise or true cloud storage people, if you really are a foreign company, and whether Internet or otherwise, then you're not going to choose someplace in the United States. So I'm having a little trouble with that being a justification for the lack of cases. Okay. I mean, maybe I'm missing something. I'm just asking. All right. I'm just saying that if you realize that you're subject to jurisdiction in the United States, then you may agree to a specific jurisdiction, and so the analysis isn't going to be under 4K2. Sure. So that may be why you don't see as many of those cases. His basic argument is, look, I'm sitting in Hong Kong, not the United States. Right. And that, you know, the Internet doesn't know any borders. It doesn't know whether it's in the United States or in the case of the Yahoo case that it, you know, that they wandered into France, so to speak. So but he's saying that you don't you haven't linked up infringement and connection with U.S. and his company. So I'd be interested in your response on that. Certainly, Your Honor. At the outset, I want to say that at the early stages of litigation, in fact, subsequent to the filing of the appeal, there was a motion to dismiss based on lack of personal jurisdiction which Judge Breyer denied. So this was further explored a little bit more, but it's not in the appellate record. But at that stage, when you're looking at it at a preliminary injunction stage or a motion to dismiss stage, if there are disputes in the evidence, then they have to be ruled in favor of the plaintiff. So I'm just asking what the evidence is. Well, what the evidence is, is our declarations and some a limited amount of documentary evidence is that we're not talking about hits. We're not talking about people that come and look at their website. And I can understand the argument that just because you're showing your website around the world, you shouldn't be able to establish jurisdiction. But people are purchasing subscriptions from them from within the United States. And the documentary evidence, we didn't get any documentary evidence from Oron. We had to go to a third party. We got documentary evidence. And I'm sorry, this just isn't in the record, but so. Well, if it's not in the record, what can I do with it? Well, I'm explaining what our allegations are. And our allegations are, and we will be able to support these allegations at a later date, and we have at a later date, is that many, many, many subscriptions are bought within the United States. Not only are the subscriptions bought within the United States. You're talking about over the 12 percent? I think it was about 25 percent. The United States is the additional 13 percent is not in the record. It's not in the record for this appeal, but. Why was the 12 percent in the record and not the additional? I'm just asking. Because those facts were not available at the time of the appeal. Okay. Subsequently, we took jurisdictional discovery and went forward on the motion. We're in a situation where, you know, just to put everybody's argument in context, we're here on a motion for review of a motion for preliminary injunction. We look at it under abuse of discretion. We recognize there hasn't been full discovery. On the other hand, you're the one that asked for the preliminary injunction, so you have to have something that gets the district court make that decision. Right. Right. And some of that was our allegations that there were sales within the United States. Also, this money that was collected from the sales in the United States is sitting in PayPal, which is right here in Palo Alto, right here in this district. Don't you have to have some evidence that those sales were generated by infringement of your works? Perhaps ultimately down the road when we go through all of this. But there's an allegation of it, and that allegation has to be, I think it's under information and belief, because the mere percentages of it, it will undoubtedly come out as true. Let's say I have some content that I put on the Web. You know, it's not great, but it's something that's on the Web. But on information and belief, I believe that they got so many people that are making hits and subscriptions in the U.S. that certainly my stuff must be in there somewhere. Does that mean I get to freeze all their assets? I think we're jumping from two different questions. So certainly if we don't have a reasonable likelihood of establishing personal jurisdiction, then we can't freeze their assets. So I understand that. But we do have a basis for personal jurisdiction. Judge Breyers ultimately said that. Now, in addition to the sales, we do have one person who acted as what they call an affiliate. So this is not like the subscriptions. What's that? The sales are the subscriptions. Right. So just a little bit of how it works and why it's not like, what is it, Dropbox. Right. So when someone puts their material on their Web site, if it's Dropbox, then they can go and look at it at a later time, and they may pay a subscription fee for that. I'm not sure exactly how it works. But what they don't do is that the owner of the Web site then, when strangers come to look at the content and wish to purchase access to it by, you know, faster access to it, then they give a kickback of that money back to the person who uploaded it. I mean, that's inducement. And it's also, Mr. Fray-Witzer said that this case doesn't involve direct infringement, but it actually does, because Oron has reproduced, stored, distributed, sold, and distributed these materials. And that extra act of inducement is the little bit of something, of volition, that makes it actually direct copyright infringement. So we do have a claim of direct copyright infringement. In addition to that ---- Well, can you just go back to Judge McKeown's question? Because I just didn't feel like you ever quite answered it. Sure. If that was all you had was the hypo she put, would that be enough? I ---- You're saying no. So, no. If she just had stuff up there? Yeah. Well, I mean ---- Because it must, it's got to be, you know, in his pot. When someone buys a subscription to Oron, they buy a subscription for this faster access to everything in their library. And we know that our material is in their library. So they are selling access to data text property to all of the subscribers that purchase subscriptions from within the United States. Now, I want to clarify, because I don't want to overstate the case. Those individuals have to know how to find that material on the website because they have to have the URL. But those URLs are distributed in other locations throughout the Internet with box covers and descriptions and everything. So that's, you know, it's kind of a, it's a three-way thing. They try to isolate it. Well, you've got, as we know, you know, they've got their servers in Hong Kong or maybe, I don't know, they could be in Russia for all I know. They don't have to be in Hong Kong. They have their servers. You have U.S.-based content that you know is on their website or accessible from their website, correct? Yes, Your Honor. Okay. And we know that they sell subscriptions to a number of people in the U.S. Whether those subscribers are downloading your materials or mine or somebody from China, we do or don't know. We know that they have the right to access that material. I understand that. But whether, in fact, in this vast library that they maintain, do we have anyone who said or do you have any evidence that your materials are among those that are downloaded or which have been incentivized for being, you know, put up there? Those allegations are in the complaint, and all of that information is in the hands of the defendants. And unfortunately, in the discovery process, they've been very reluctant to provide it. I don't think there's any doubt that that is the case, and it is alleged. Let me just go back to jurisdiction then. He kind of popped through a couple of things the district court had said, the number of hits, which everybody agrees in and of itself can't be a baseline. He says Oron's profit, and then he says, but there's no proof about that. What is your response on that point? I'm sorry. I don't know if I misunderstood him or I didn't quite hear you correctly. I think what he was saying that there's no evidence that links that they've had any profits or revenues that come from the alleged infringement, your infringement of your materials. Right. And my response to that is, again, in the way that they sell it, they sell a huge anthology. So they sell access to our material to U.S. residents. Whether those U.S. residents take them up on accessing that content or not, we don't know that yet, but they certainly have the availability. They're selling access. Right. And making it available, I think, is a copyright infringement, and it affects us here in the United States. Now, one of the other things that they looked at was a relationship with a company called PornGuardian, which is a company that works on behalf of copyright owners to identify infringing material on various sites and send takedown notices. And they had extensive interaction with these people at PornGuardian who worked for DataTek, knowing that they represented United States copyright holders, and then also knowing that they gave — normally when you take a DMCA notice, it's the service provider's responsibility to then remove that material. They delegated that responsibility. They delegated it to someone working on our behalf who was more than willing to do it, PornGuardian, so that they could take it down directly. And I don't deny that that's, you know, perhaps a good thing so that we can get it down quicker. But still, it's their responsibility, and they've delegated it to a U.S. company to remove that material. The point of this is, you know, because that's what — there often is delegation because — I don't know of this site, but there's a lot of other sites where the amount of content is so huge, YouTube and some of the others, where they literally are buried in these takedown notice requests. But you're saying because they, in effect, transferred it back to the U.S., it's one more, quote, foot in the U.S.? I think so, Your Honor, yes. And again, perhaps not one that alone would cause jurisdiction, but when you look at all their interactions with the U.S. The other thing is that the affiliates that they're paying to put up material and, you know, are at least one in the U.S. Now, we have — we've only begun to try to, you know, ferret these people out. We had someone who came to us, fortunately, so we have one person who has said Oron has paid me here in the United States to upload content. But we know that there's — you know, it's rather extensive. And we want to go back to this idea of the court shifting the burden of proof. The court didn't shift the burden of proof. The statute for damages under the Copyright Act says that once the copyright holder has identified the profits made by the infringer, then it's the infringer's — the burden shifts to the infringer, because they're the people that hold the records and can sort things out, and they have to say, okay, how much of these profits came from the sale or distribution of the infringing content, as opposed to any other reasons. Now, at this stage in the game, we don't know all of the profits made from this infringing website, but we do know that everything that — all of their assets that they have currently came from the infringing website, because even in the briefs before this Court, they've said that's their only operation. That's the only way they earn money is from subscriptions. Now, what they argue under the Polar Bear case, the Timex case, is that if it's — if the damages are not sufficiently linked to the infringing — or the profits aren't significantly linked to the infringing activity, then you have to — it becomes the plaintiff's burden to narrow it down a little bit. But in all of those cases, what we're talking about is copyright infringement that occurred in advertisements. So that's why it was indirect. Here, the revenue comes from the one thing they do, sell access to content. This is direct, and that's what the district court, Judge Breyer, said, and I think that's absolutely right. And it becomes — you know, this is — even this is an equitable relief, the shifting of the burden. And I think it becomes even more important at the early stages in the litigation because the issue is that the defendants control the — all of the records. And the idea behind this shift — The Polar Bear case was after trial. So, I mean, you're really looking at a fairly precise — I was trying to even understand what the — what you're arguing and what he's arguing is the impact of the Polar Bear case, because we're here on a preliminary injunction where we — nobody's allocating profits yet. I mean, we're — you're alleging, I understand, but — so what's the — what is the significance? That's right. Well, he's saying — I think his argument, and I'll let him clarify when he comes up here, is to say that if we're going to enjoin these illicit profits, we should enjoin the — we should only enjoin them after we've proven that there are illicit profits. And we haven't done that because he's saying that it's too indirect. But I think under the statute, we've met our burden. They can then come back and provide evidence that some of that money isn't attributable to the infringement of our works or has to do with the overhead. But I want to know one thing. In the briefs — I mean, this — it's a pretty severe — it's in the nature of a prejudgment attachment, basically, what we have here, right? It's not, Your Honor. Why not? Because this is a — this is an equitable remedy, and I wish I remembered the case law. I've read a lot of cases this weekend, but there is a case somewhere, and maybe I can get it to you later if you give me permission, where the Court specifically said that a prejudgment attachment under State law is not the same as a disgorgement of profits. What they have is they have our money. But, I mean, basically, they have — but it has the same effect. In other words, you've tied up, in anticipation of proving profits, you've tied up their money, right? And the long-holding legal standard is that where a judge has the ability and authority to give final equitable relief, the judge has the ability to maintain the status quo so that that final equitable relief has some meaning. And if the Court were to lift this, that won't, because the money will disappear. It will go — there's pretty ample evidence that it goes to Hong Kong and then to the Court. Kagan. You're talking about moving around assets before. Yes. Yeah. It will be virtually impossible to get to. So, and the only other thing is that they did not ask for a limitation on the amount in their papers. They only said that the injunction was improper. If you want to submit any supplemental authorities, again, the Court has a piece of paper on that. You don't need to make any argument on it. You can just provide us the citation. Thank you, Your Honor. I want to, first, Your Honor, answer your question, since I feel that's the most  I think it's important to make the point that, in the case of the plaintiff, in section 165 at the end of the district court's order, what Judge Breyer says is, at trial, the plaintiff has the burden of establishing the defendant's total revenue. But at this early stage in the litigation, it would be impossible for the plaintiff to make such a showing. Accordingly, the Court will not reduce the scope of the asset freeze until Magnet makes some showing regarding what, if any, portion of the frozen assets could not ultimately be subject to the equitable relief sought by Data Tech. They shifted the burden to Oron. The Court shifted the burden to Oron to say, here's what's not attributable to the infringement. The problem, of course, is Data Tech hasn't shown anything that is attributable to the alleged infringement. And, in fact, Well, but the way it works in copyright cases is that, in effect, all the plaintiff has to do is throw up on the wall the total revenues, and the defendant has to back them out, correct? Well, that is part of the statute, Your Honor. And we've cited the cases, and I believe Mackie is one of the leading ones, that basically says, you can't simply say, there are the revenues of General Motors, and General Motors used our picture on the front of their annual report, and now it's up to General Motors to have to prove what portion of their profits aren't attributable to our picture that they stole. That is, in essence, what Data Tech is doing here. And it is, in essence, what they're doing here in part because the only record evidence of what percentage of Data Tech's materials were on Oron's servers is the affidavit of Stanislav, who is the owner of Oron, and it's at Record Appendix 140. And he said, Plaintiff's files comprised a minuscule percentage of the data stored on Oron's website. When in operation, Oron had hundreds of millions of files on more than 70 high-end servers with terabytes of hard drive space. Their allegations are that we had a few thousand of their files on our servers. Even assuming that that ends up being correct, we are talking about a small fraction of 1 percent of the files that were on Oron's servers. And yet they're saying that all of the profits that could be attributable to Oron's operation are up there, just like as if you were saying General Motors profits are up there because some of our stuff, a tiny portion of our stuff, may have attracted. We don't know if it attracted, but may have attracted people to your website. Well, let me just try to unpack that a little bit. So you're – we're really talking about these assets that are sitting in PayPal, or? Well, that's a very good question, Your Honor, because there are a few different places. There are assets in PayPal. I'd like to simply mention that although PayPal is headquartered in California, Oron never dealt with PayPal in California. They dealt with PayPal in Singapore. That is part of the record. So that connection to the United States doesn't really exist. There is approximately a million dollars being held in Hong Kong, and that's important because what you haven't heard is that not only does the plaintiff have this action where we argue it is improper, but they have an action in Hong Kong where it would be proper for them to bring an action because they certainly do have jurisdiction over our clients in Hong Kong. They've managed to get an asset freeze in Hong Kong. That shows that any rights that they need to have protected are well protected in the place of a jurisdiction. When did that come about time-wise with respect to Judge Breyer's order? That came about almost simultaneously. Before or after? I cannot. Makes a difference, doesn't it? There was a prior case, and I'm happy to present it was after Judge Breyer's order. There was a prior case out of Nevada involving a different plaintiff. Right. There had been an asset freeze. The asset freeze in Hong Kong was about to be released just before it was released. The plaintiff here went into court ex parte, said, look at all the stuff that happened in Nevada. You should do the same thing. It was really amazing. You go back after the injunction and say, well, you know, we think, of course, you're wrong completely. But even if you're part right, you have overseased anything. Yes. We most certainly did. Judge Breyer essentially said, in fact, we made a few arguments. We said you've overseased because even if you look at the infringements, it can't possibly add up to this amount. We've also made the argument that because all of Oron's assets are frozen, they can't even afford to defend themselves. And surprisingly — I know you made that argument, but I'm not asking you how your fees are paid. But I did scratch my head. But surprisingly, Judge Breyer said to us, well, you're not entitled to defend yourself with their money. And we said it's not actually their money just yet. In fact, you look at Grupo Mexicano and it says this is the nuclear bomb. The complete attachment asset freeze is the nuclear bomb of litigation because it makes it impossible for the — I thought Judge Breyer released funds so that you guys could be paid. Your Honor, Judge Breyer had initially released funds. Most of those funds were given to predecessor counsel. Some of the funds were paid to us. When those funds were used up, we went back to the Court and we again said the litigation is active. There's an appeal before the Ninth Circuit. There's lots of things going on here. We need additional funds released. And the judge again said, because you haven't demonstrated to this Court what portion isn't attributable, I'm not releasing any of the funds. Unless there's other questions from the panel, I think you've got your argument in mind. Thank you. Both counsel for your argument this morning, the case of Data Tech v. Magnet Limited is submitted and we're adjourned. Thank you. All rise.
judges: Marbley, McKeown, Watford